

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2002

# USA v. Robinson

Precedential or Non-Precedential: Precedential

Docket No. 00-1328

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Robinson" (2002). *2002 Decisions.* Paper 565.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/565

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 13, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-1328 & 00-1715

UNITED STATES OF AMERICA

v.

MITCHELL ROBERTSON
a/k/a MITCHELL ROBINSON
a/k/a BRYHEER McMICHAEL

Mitchell Robinson,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 99-cr-00484
(Honorable Edmund V. Ludwig)

Argued April 5, 2001

Before: SCIRICA, AMBRO and GIBSON,*
Circuit Judges

(Filed September 13, 2002)

_____

* The Honorable John R. Gibson, United States Circuit Judge for the
Eighth Judicial Circuit, sitting by designation.

DAVID L. McCOLGIN, ESQUIRE
 (ARGUED)
Defender Association of Philadelphia
Federal Court Division
Curtis Center, Suite 540 West
Independence Square West
Philadelphia, Pennsylvania 19106

 Attorney for Appellant

CAROL M. SWEENEY, ESQUIRE
 (ARGUED)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106

 Attorney for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Mitchell Robertson entered a conditional guilty plea 1 to possession of ammunition by a convicted felon, a violation of 18 U.S.C. S 922(g)(1).2 The sole issue on appeal is whether police officers had reasonable suspicion to stop a public bus on which Robertson was traveling and search for and seize a handgun and ammunition. We will affirm.

I.

On April 29, 1999, at 12:10 p.m., Philadelphia Police Captain Joseph Sullivan of the 35th Police District and

_____

1. Under Fed. R. Crim. P. 11(a)(2), "a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion." Robertson entered a conditional guilty plea under Rule 11, preserving his right to appeal the denial of his motion to suppress. See also United States v. Zudick, 523 F.2d 848, 851 (3d Cir. 1975).

2. He was sentenced to sixty-six months' imprisonment, three years of supervised release, a $500 fine, and a $100 special assessment.

Officer Joseph Carolyn, his driver, responded to a radio call that police officers were pursuing two male robbery suspects on the run, in the area of 18th Street and 66th Avenue. At least one of the suspects was allegedly armed. A second radio report described the men as African-American, one wearing a white shirt and reddish pants, the other a white or gray shirt and dark pants, possibly blue jeans. After traveling ten to twelve city blocks, Captain Sullivan and Officer Carolyn met up with several other officers in the 6600 block of Gratz Street, one-half block west of 18th Street. Captain Sullivan and Officer Carolyn left their unmarked patrol car to speak with the other officers.

At this point Captain Sullivan saw two men running "in the eastbound actual traffic lanes" of 66th Avenue, crossing the intersection of Gratz Street.3 Believing these two men fit the descriptions he had just received, Captain Sullivan instructed Officer Carolyn to return to their car, pick him up, and follow the suspects. The patrol car was parked a quarter of the way up Gratz Street, facing north, and Officer Carolyn had to back up to get onto 66th Avenue. A line of buildings and houses caused Captain Sullivan to lose sight of the two men after they turned the corner onto 66th Avenue. When Officer Carolyn arrived with the car, approximately one minute later, they proceeded east on 66th Avenue.

Just then, a van pulled alongside Captain Sullivan's window, and the van driver gestured to roll down the police car's window. Captain Sullivan described the van driver as a heavy-set African-American male in his late forties to early fifties. The van driver informed Captain Sullivan the

3. The two men Captain Sullivan saw were apparently running toward the robbery scene. But the direction of their flight may or may not be legally consequential. Fleeing robbers may have changed direction for a certain purpose. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight -- wherever it occurs -- is the consummate act of evasion; it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). The direction the suspects were running remains one of many factors to consider in evaluating the"totality of the circumstances." Here, we do not believe it negates the reasonable suspicion that these men were the alleged robbers.

3

two men he was "looking for" had boarded a SEPTA bus4 a few blocks away on 66th Avenue: "Officer, them two guys you're looking for just got on that bus." Captain Sullivan did not ask the van driver's name, address, or telephone number. The two officers chased after the eastbound SEPTA bus, stopped and boarded it. Two to three minutes elapsed between the time Officer Carolyn obtained the car and the time the officers boarded the bus.

Among the twelve to fifteen passengers on the bus, Captain Sullivan saw two men matching the descriptions of the robbery suspects. Both were seated in the rear of the bus. Captain Sullivan testified that Robertson, one of the two men, was wearing a grayish shirt with dark pants 5 and the person sitting next to Robertson was wearing a white shirt and red pants.6

Upon boarding the SEPTA bus, Captain Sullivan made eye contact with Robertson. He saw Robertson remove an item from his waistband with his right hand, reach over the passenger seated next to him, and place the item behind the seat in front of him and to his right -- on top of the bus's wheel well. Based on his experience, Captain Sullivan believed Robertson was trying to hide a concealed weapon. Captain Sullivan drew his weapon and ordered Robertson to lie on the floor. A search of the wheel well by another officer revealed a loaded five-shot break-open revolver.

Other officers brought the robbery victim to the scene, but the victim was unable to identify Robertson and his companion as the robbers. The recovered weapon was of indeterminate age and therefore, could not form the basis of a weapons possession charge. See 18 U.S.C. S 921(a)(3)

4. The Southeastern Pennsylvania Transportation Authority provides public bus transportation for the City of Philadelphia.

5. The color of Robertson's clothing that day remains somewhat in dispute. Two other officers testified Robertson was wearing blue or dark jeans and a gray or dirty white shirt with black lettering on the front. Photographs taken at police headquarters show Robertson wearing a black T-shirt and jacket. Robertson's prison receipt lists a black T-shirt, black jeans, and a multi-colored jacket.

6. There is no dispute this person matched the description of the second suspect.

(1994).7 Robertson was charged with illegal possession of ammunition by a convicted felon, a violation of 18 U.S.C. S 922(g)(1).8 After a hearing on Robertson's motion to suppress, the District Court held the police officers "were justified in stopping the SEPTA bus, having formed the . . . reasonable belief that the two robbery suspects had gotten on the bus and believing that at least one of them had a gun." This appeal followed.

II.

The District Court had jurisdiction under 18 U.S.C. S 3231. We have jurisdiction under 28 U.S.C.S 1291.

III.

The central question on appeal is whether Captain Sullivan had reasonable suspicion to stop and board the SEPTA bus on which Robertson was traveling. As in all difficult suppression cases, we must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior. The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause. Katz v. United States, 389 U.S. 347, 356-57 (1967). But under the "narrowly drawn authority" of Terry v. Ohio, 392 U.S. 1, 27 (1968), an officer without a warrant "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a

---

7. Federal firearms statutes do not regulate the possession of firearms manufactured prior to 1898. The manufacture date of Robertson's firearm could not be established, so no federal prosecution for the gun could ensue. But the government proceeded with the ammunition count, which has no chronological limitation. See 18 U.S.C. SS 921(a)(16), 921(a)(17).

8. Robertson, also known as "Mitchell Robinson" and "Bryheer McMichael," possessed five live rounds of ammunition, loaded in a Spanish break-open revolver with an obliterated serial number. Robertson has twice been convicted of crimes punishable by more than a year in prison.

reasonable, articulable suspicion that criminal activity is afoot." Wardlow, 528 U.S. at 123.

To determine whether reasonable suspicion exists, we

must consider the " 'totality of the circumstances -- the whole picture.' " United States v. Sokolow , 490 U.S. 1, 8 (1989) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)); see also United States v. Arvizu, 534 U.S. 266, 122 S. Ct. 744, 750-51 (2002) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (quotation and citation omitted)). In United States v. Nelson, 284 F.3d 472 (3d Cir. 2002), we described Arvizu as follows: "In the Supreme Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard, it accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." Id. at 482.

Moreover, we are appropriately reluctant to "second-guess" investigative decisions made by officers in hot pursuit of criminal suspects. E.g., United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2000) ("The officers knew the suspect was still in the vicinity, and had they stalled for more lengthy questioning of the informant, the armed suspect could have escaped detection."), cert. denied, 532 U.S. 1014 (2001); United States v. Brown, 159 F.3d 147, 149 (3d Cir. 1998) ("A police officer may conduct a warrantless stop and frisk if specific and articulable facts, together with all rational inferences, suggest that the suspect was involved in criminal activity.") (summarizing Terry). The Supreme Court has held "the determination of reasonable suspicion must be made on common sense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125.

IV.

The District Court found the stop of the SEPTA bus was supported by reasonable suspicion and the search and

seizure was valid. We exercise plenary review over the District Court's conclusions regarding reasonable suspicion. We review the District Court's factual findings for clear error. United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998). We exercise plenary review over the District Court's application of law to the facts of this case. Id.

As noted, calculating whether an officer has reasonable suspicion to warrant a stop and search is often an imprecise judgment. Arvizu, 122 S. Ct. at 751 ("Our cases have recognized that the concept of reasonable suspicion is somewhat abstract."); Wardlow, 528 U.S. at 125 ("[W]e cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists."). The determination is often made under exigent circumstances requiring quick, decisive reactions. Under this set of facts, Captain Sullivan had a reasonable suspicion that the two

suspects he viewed sprinting through the streets of Philadelphia, in close proximity to the scene of the armed robbery, had committed the crime. See Alabama v. White, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

The "total picture" in this case demonstrates Captain Sullivan reasonably suspected the men who boarded the bus were the suspected armed robbers. In reaching this determination, Captain Sullivan relied on his experience and training, indispensable to his evaluation of reasonable suspicion. Cf. Terry, 392 U.S. at 30; see also Ornelas v. United States, 517 U.S. 690, 699 (1996) ("[A] police officer views the facts through the lens of his police experience and expertise.").

It is well settled that reasonable suspicion can be based on information gathered from another person. Adams v. Williams, 407 U.S. 143, 147 (1972). Robertson contends Captain Sullivan improperly relied on statements from the van driver before deciding to stop the SEPTA bus. We

disagree. Information provided by the van driver was reliable because it was provided by a witness "reporting what he had observed moments ago, not what he learned from stale or second-hand sources." Valentine , 232 F.3d at 354. The van driver spoke directly to Captain Sullivan, who had at least a fleeting "opportunity to assess[his] credibility and demeanor." Id. at 350. The van driver was in the area where an armed robbery had just occurred. He was driving on the same street where two "armed" fleeing men had been spotted. Cf. Brown, 159 F.3d at 150 (suspect's presence in "close proximity to the crime scene a few minutes after" a crime supported a finding of reasonable suspicion). He initiated contact with Captain Sullivan and, without being prompted, said the "two guys" pursued had just boarded the SEPTA bus. "[I]n light of the total circumstances," the information was "sufficiently trustworthy." Valentine, 232 F.3d at 355.

No doubt in perfect hindsight and with more time, Captain Sullivan might well have asked the bystander more questions. But elaboration or corroboration in these circumstances can delay -- and even terminate-- effective pursuit. Valentine, 232 F.3d at 355. This concern is not abstract. At the suppression hearing Captain Sullivan was asked by defense counsel whether he had seen the van driver before, whether the van driver was an "officer," and whether he took the van driver's name, address or telephone number. To all these inquiries, Captain Sullivan answered, "No, I was a little more concerned with catching

that bus." If Captain Sullivan had waited to determine if the van driver had a basis for his statement, the fleeing suspects may well have escaped. It is legally insignificant that Robertson was not ultimately identified by the victim as the armed robber. Florida v. J.L., 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

Nor do we believe Captain Sullivan's "hot pursuit" of the suspects had turned "cold" by the time he boarded the bus. Only two to three minutes passed between the time Officer Carolyn began backing down Gratz Street and the time Captain Sullivan stopped the bus. Under this set of facts,

8

the "hot" pursuit remained quite warm. Nor is there any allegation or hint that Captain Sullivan's "hot pursuit" of Robertson was a pretext. Captain Sullivan reasonably thought he was chasing armed robbers through Philadelphia city streets. His decision to stop the bus was based on a "common sense judgment." Wardlow, 528 U.S. at 125.

Robertson characterizes the van driver as an "anonymous informant." We disagree. We view this as essentially a hot pursuit case, aided by a bystander's informative tip. For Fourth Amendment purposes, the information the van driver provided Captain Sullivan, coupled with the other circumstances, justified a "brief investigatory stop" of the bus. Accord Valentine, 232 F.3d at 353. Regardless, the information conveyed by the van driver contained several indicia of reliability, distinguishing it from the truly anonymous tip in Florida v. J.L. See 529 U.S. at 271 (police cannot rely on "the bare report of an unknown, unaccountable informant who has neither explained how he knew [certain information] nor supplied any basis for believing he had inside information about [the suspect]").

We cannot divorce the information provided by the van driver from the surrounding circumstances of the hot pursuit. The Supreme Court has rejected this type of bifurcated analysis:

> The [Court of Appeals for the Ninth Circuit] appeared to believe that each observation by [a border patrol agent] that was by itself readily susceptible to an innocent explanation was entitled to "no weight." Terry, however, precludes this sort of divide-and-conquer analysis. The officer in Terry observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation."

Arvizu, 122 S. Ct. at 751 (citations omitted); see also Nelson, 284 F.3d at 484 (reiterating that the circumstances

surrounding an anonymous tip -- "its content and import, and the knowledge of the officer receiving it"-- must be

considered to determine whether reasonable suspicion existed).

Furthermore, we believe United States v. Roberson, 90 F.3d 75 (3d Cir. 1996), is inapposite. In Roberson, the Philadelphia Police Department 911 officer received an "anonymous tip" of criminal activity at the 2100 block of Chelten Avenue. Id. at 76. Police officers, who were unaware of the activity before receiving the call, approached a person matching the tipster's profile. Id. We reversed the district court's refusal to suppress evidence obtained through a subsequent search, largely because the police, "dealing with an anonymous and bare-bones tip," had "no basis for assessing either the reliability of the informant or the grounds on which the informant believed that a crime was being committed." Id. at 80.

Roberson is distinguishable in at least three significant ways. First, the investigation in Roberson was initiated because of an anonymous telephone "tip." Here, Captain Sullivan was already pursuing persons matching a description, provided by other police officers, of two men who had just committed an armed robbery and were sprinting through a specific area. Having observed the fleeing suspects board the SEPTA bus, the bystander told Captain Sullivan where the men he "was looking for" had gone. Second, in Roberson, "[t]he officers could have set up surveillance of the defendant" in order to corroborate the "non-predictive, anonymous tip they received." 90 F.3d at 81. Here, Captain Sullivan, in hot pursuit, did not have time to ask for details without risking the suspects' disappearance. Finally, in Roberson we expressly declined to extend our holding beyond the facts presented, namely, when an anonymous tip suggests a defendant is selling drugs. 90 F.3d at 81 n.4 ("We do not address whether such a tip is sufficient to create reasonable suspicion when the tip involves an allegation that the defendant was carrying a gun rather than dealing drugs. Under those circumstances, a different rule may apply.").

In sum, we believe the totality of the circumstances demonstrates Captain Sullivan had reasonable suspicion to stop the SEPTA bus on which Robertson was riding. On these facts, Captain Sullivan reasonably relied on the

credible information the van driver provided and made a "common sense" judgment consistent with constitutional requirements.

V.

Next we consider whether the search for and seizure of Robertson's firearm and ammunition was consistent with the Fourth Amendment. As noted, Captain Sullivan had the requisite reasonable suspicion to stop the public bus on which Robertson was riding. Given the possibility that the suspects might have been carrying weapons,[9] Captain Sullivan testified that when boarding the bus, he was concerned for his personal safety. As the Supreme Court held, "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. A limited search of the suspects for weapons was justified under these circumstances.

But more significantly, Captain Sullivan saw Robertson remove an item from his waistband, reach over the adjacent passenger, and place the item on top of the bus's wheel well. Captain Sullivan reasonably believed Robertson was trying to hide a concealed weapon. Therefore, Robertson also posed a threat to the bus passengers' safety. Cf. Terry, 392 U.S. at 27:

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion, or "hunch," but to the specific reasonable

---

9. To reiterate, in the radio report Captain Sullivan heard, officers broadcast that they were in pursuit of two males in connection with a robbery, and that at least one of the males was armed with a handgun.

11

> inferences which he is entitled to draw from the facts in light of his experience.

See also Nelson, 284 F.3d at 483 (noting the "Supreme Court's consistent prior teaching that an officer, in determining whether there is reasonable suspicion, may take into account reports of an active threat, including the presence and use of dangerous weapons"). Given Robertson's movements on the bus, which were observed by Captain Sullivan, the search for and ultimate seizure of Robertson's handgun and ammunition were justified.

VI.

We reserve the broader question whether police need reasonable suspicion to stop a public bus.[10] Accord United States v. Leon, 468 U.S. 897, 905 (1984) ("Although it is undoubtedly within our power to consider the question . . .

that question has not been briefed or argued; and it is also within our authority, which we choose to exercise, to take the case as it comes to us . . . .").11

The Supreme Court, in a case involving an allegedly unconstitutional search on a public bus, recently reiterated that "for the most part, per se rules are inappropriate in the Fourth Amendment context." United States v. Drayton, ___ U.S. ___, 122 S. Ct. 2105, 2111 (2002) (holding the proper

_____

10. Even assuming Robertson had an expectation of privacy on this public bus, the firearm was located on the bus's wheel well, not, for example, in luggage Robertson carried. To that extent, the search was of the bus itself, not of Robertson's person or belongings.

11. Compare Delaware v. Prouse, 440 U.S. 648, 653 (1979) ("stopping an automobile and detaining its occupants constitute a'seizure' [for the Fourth Amendment"), and United States v. Hernandez-Zuniga, 215 F.3d 483, 486-87 (5th Cir. 2000) (assuming that a stop of a bus by the police constituted a seizure) (citing cases), with Florida v. Bostick, 501 U.S. 429, 436 (1991) (holding that if police board a bus during a regular stop, the relevant inquiry is "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter"), and United States v. Gonzales, 979 F.2d 711, 712-13 (9th Cir. 1992) (boarding of bus implicated no constitutional rights where it occurred at a stoplight and transpired "pursuant to an agreement between the bus company and the border patrol").

12

inquiry considers the totality of the circumstances). In Drayton, the Supreme Court rejected a categorical rule that evidence obtained during suspicionless drug interdiction searches on public buses must be suppressed unless police officers advise passengers of their rights not to cooperate and to refuse consent. Id. at 2111-12; see also id. at 2112 ("It is beyond question that had this encounter occurred on the street, it would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure."). The proper test is the totality of the circumstances. As noted, once on the bus Captain Sullivan reasonably believed he saw Robertson remove a firearm from his waistband and place it on top of the bus's wheel well. Under these circumstances, the search and seizure here is not unlawful under the Fourth Amendment.

VII.

For the foregoing reasons, we will affirm the judgment of the District Court.

13

JOHN R. GIBSON, Circuit Judge, dissenting:

I respectfully dissent. In my view, the court errs today in

two significant respects. First, I disagree that Captain Sullivan was in hot pursuit--not after instructing Officer Carolyn to get the car which, was parked a quarter of the way up Gratz Street, waiting approximately a minute to get picked up, backing out onto 66th Avenue, and only then proceeding in the direction that the two men he had briefly glimpsed were running. Second, and even more important, the tip here does not involve the relating of a simple fact observed by the van driver, but rather his statement that the men Captain Sullivan was looking for got on the SEPTA bus. This is simply a conclusion unsupported by any basis, at best an "inchoate and unparticularized suspicion or 'hunch,' " Terry v. Ohio, 392 U.S. 1, 27 (1968), insufficient to justify a stop. I would reverse.

I.

With respect to the court's hot pursuit discussion, there is serious question as to whether the total period of time, from Officer Carolyn obtaining the car to the boarding of the bus, was actually two to three minutes. Captain Sullivan first testified on cross-examination that it took approximately one minute for Officer Carolyn to get the car. In fact, by the time the officers emerged onto 66th Street, so much time had passed that Captain Sullivan testified that he believed he'd lost the suspects. Then the van driver entered the picture, and Captain Sullivan testified further that approximately two to three minutes had passed from the time the car was retrieved to the time he encountered the van driver. That brings the total time from the spotting of the running men to the conversation with the motorist to three to four minutes. While Captain Sullivan testified still later that the total time from obtaining the car to pulling over the bus was two to three minutes, his earlier testimony calls that estimation into doubt. Whatever the exact time period, I conclude there was no hot pursuit in this case, but rather a trail gone cold, if not frigid or even frozen.

I further disagree with the application of any sort of hot pursuit analysis because the hot pursuit exception to the

14

warrant requirement requires police to have probable cause. United States v. Santana, 427 U.S. 38 (1976). In fact, at oral argument the Government explicitly denied that it was asking this court to extend the hot pursuit exception to Terry stops based on reasonable suspicion. Accordingly, because Captain Sullivan relied on an unknown and unidentified van driver's tip in stopping the bus, we should be primarily guided by cases involving stops based on anonymous tips. But see supra at 9 ("Robertson characterizes the van driver as an 'anonymous informant.' We disagree. We view this as essentially a hot pursuit case, aided by a bystander's informative tip.").

II.

This court recently considered anonymous tips and the role they play in creating reasonable suspicion in United States v. Roberson, 90 F.3d 75 (3d Cir. 1996). The tip in Roberson was that a "heavy-set, black man wearing green pants, a brown leather jacket, and a white hooded sweatshirt was selling drugs on the 2100 block of Chelten Avenue" in Philadelphia. Id. at 79. Despite the fact that officers found a man fitting that description when they arrived at the scene, this court concluded that reasonable suspicion was lacking for a stop because "the police had no basis for assessing either the reliability of the informant or the grounds on which the informant believed that a crime was being committed." Id. at 80 (emphasis added). In his opinion for the court, Judge (now Chief Judge) Becker set out the principles used in analyzing whether such tips are a sufficient basis for police action. Id. at 77.

Judge Becker first discussed the two-factor Aguilar/Spinelli test, formerly used to evaluate an informant's tip in the probable cause context. Id. (citing Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964)). That test required that an informant's tip, to be credible, "had to indicate both the basis for the informant's knowledge and facts sufficient to establish its veracity or reliability." Id.  As Judge Becker pointed out, the Supreme Court later abandoned this two-part test in favor of a totality of the circumstances approach under which the Aguilar/Spinelli factors are

15

"better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id.  (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)). This totality of circumstances test was extended to the reasonable suspicion context in Alabama v. White, 496 U.S. 325 (1990).

In White, the Court upheld a Terry stop based upon an anonymous informant's telephone tip. 496 U.S. at 332. The informant in that case alleged that a certain woman was in possession of illegal drugs, and predicted that this woman would leave a particular apartment, at a particular time, in a particular car, and then drive to a particular location. Id. at 327. Most of the tip was corroborated by police before they stopped the woman. Id. Despite the plethora of descriptive and predictive information contained in the tip (as opposed to the case before us here), the Court recognized that White was "a close case," id. at 332, and only concluded that there was reasonable suspicion because "police observation showed that the informant had accurately predicted the woman's movements." Florida v. J.L., 529 U.S. 266, 270 (2000).

Most recently, in J.L., officers received an anonymous

phone call alleging that a young African-American male wearing a plaid shirt was standing at a particular bus stop and carrying a gun. 529 U.S. at 268. Even though the police officers who investigated the tip did indeed find a man fitting that description at the bus stop, the Court held that the call did not provide them with reasonable suspicion to stop the man, because the tipster in that case had "neither explained how he knew about the gun nor supplied any basis for believing he had inside information." Id. at 271.

As Judge Becker observed in Roberson, while White stressed the importance of the officer's ability to corroborate significant aspects of the tip and the tip's ability to predict future events, it also reiterated that the Aguilar/Spinelli factors "remain'highly relevant in

16

determining the reliability of [an informant's] report.' " White, 496 U.S. at 328 (quoting Gates, 462 U.S. at 230), cited in Roberson, 90 F.3d at 80; cf. J.L. , 529 U.S. at 271 (holding tip insufficient because it "left the police without means to test the informant's knowledge or credibility"). Here, the corroboration of descriptive or predictive information generally relied upon in finding reasonable suspicion in the anonymous tip context is lacking. More disturbing, there is nothing in the tip to establish the informant's basis of knowledge. This is critical because without something to demonstrate that the van driver was not only honest but also "well informed," White, 496 U.S. at 332, Sullivan is left acting purely upon the van driver's impermissible "hunch," Terry, 392 U.S. at 27.

I examine the factual issues separately, for the sake of clarity. This does not accord them "independent status," but rather facilitates application of the totality of circumstances test, recognizing, as stated above, that "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Gates, 462 U.S. at 233, quoted in Roberson, 90 F.3d at 77.

A.

The lack of anything in the tip to establish a basis of knowledge on the part of the van driver is the most glaring defect in this case. See J.L., 529 U.S. at 271 (holding that even where police verified the description of the suspect given by the anonymous informant, the fact that the tipster "neither explained how he knew about the gun nor supplied any basis for believing he had inside information" precluded finding of reasonable suspicion); cf. White, 496 U.S. at 332 (concluding reasonable suspicion was present where"there was reason to believe not only that the caller was honest but also that he was well informed, at least enough to justify the stop"). As discussed above, basis of knowledge continues to be a relevant consideration in the totality of

the circumstance analysis. Here, the van driver had at best an "inchoate and unparticularized suspicion or'hunch,' " Terry, 392 U.S. at 27, that the men he saw get on the bus

were the same men Sullivan was looking for. When he imparted this hunch to Sullivan it gained no greater substantive content, and Sullivan did nothing to determine whether the driver had any basis at all for his hunch. Sullivan himself thus had no more than a hunch that there was criminal activity afoot on the bus. This is simply not enough to justify a stop. Id.

Roberson concluded that since the descriptive information provided by the tip in that case was readily observable, all the Government was left with was the fact that the defendant was standing on a "hot" high-crime corner, and "[t]his is not enough." 90 F.3d at 80. Similarly in this case, all that Captain Sullivan could glean from the informant's tip was that (1) some men had gotten on a bus and (2) the informant assumed these men were sought by the police. There was nothing in the tip to provide a "reason to believe" that the van driver was "well informed" and had any basis for knowing that the men getting on the bus were those sought by the police.1 White, 496 U.S. at 332. Nor did Captain Sullivan seek any details to establish the basis for this assumption or hunch. To paraphrase Judge Becker in Roberson: I simply cannot accept the Government's position that any citizen getting on a bus who, without otherwise engendering suspicion, is unlucky enough to be the subject of a non-predictive anonymous tip is subject to a Terry stop simply because a crime has been committed in the area. See 90 F.3d at 80.

The court seeks to distinguish Roberson. Supra at 10. It

_____

1. While it may be argued that sufficient basis of knowledge should be inferred from the fact that the van driver was in the area and pointing to a bus the suspects could conceivably have reached, we should decline to make such an inference absent something more in the content of the tip. Cf. 4 Wayne LaFave, Search and Seizure, S 9.4(g) at 211 ("[A]n unexplained assertion by the police (or, to the police by another) that a person looks suspicious is not entitled to weight.") (footnote omitted) (3d ed. 1996). This is not the same thing as "categoriz[ing those] factors . . . as simply out of bounds in deciding whether there was 'reasonable suspicion' for the stop." United States v. Arvizu, 122 S. Ct. 744, 748 (2002). Rather, I simply conclude that the totality of circumstances here does not give rise to reasonable suspicion in light of the binding anonymous informant precedent set out in this dissent.

argues that this case is different because Captain Sullivan already knew a crime had been committed and the van driver merely pointed out where the men Captain Sullivan was looking for had gone. This but accentuates the lack of

any basis for the van driver's knowledge of who Captain Sullivan was looking for. To establish the basis for this knowledge, the court itself must add to the tip the words "pursued," supra at 8, and "having observed the fleeing suspects," supra at 10, to support the bald, conclusory statement, "The guys you are looking for, they just got on that bus." Had the tip contained such additional language, we would have a far different case. But this language is not in the record--the van driver did not mention fleeing or pursued suspects. This addition of language is a vital step in the court's decision, as it supplies for itself the support for the tip which is lacking in the record. The van driver stated only that the men Captain Sullivan was looking for had gotten on the bus. He gave no information to support his raw conclusion or assumption that the men he saw were the "suspects" that Sullivan was looking for. He said nothing to demonstrate how he reached this conclusion, and the court errs today in supplying it for him. The facts in the record before us are not sufficient to justify the court's conclusion.2

_____

2. The court also attempts to distinguish Roberson because "[h]ere, Captain Sullivan, in hot pursuit, did not have time to ask for details without risking the suspects' disappearance." Id. Suffice it to say that this argument rests on the proposition that a public bus may disappear in the time it takes to ask: "Were they running?" or "Was one of them wearing red pants?" Finally, the court suggests this case is different because the suspects here were alleged to be armed. There is no firearm exception to Terry, however. See Florida v. J.L., 529 U.S. 266, 272 (2000) ("Our decisions recognize the serious threat that armed criminals pose to public safety; Terry's rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern."). Of most significance is that the relevance of Roberson is the analytical framework it sets out, not any particular set of facts it does or does not encompass.

19

B.

In order for an anonymous tip to supply reasonable suspicion it must bear indicia of reliability. J.L., 529 U.S. at 274. The Supreme Court has looked for these indicia of reliability in the form of predictive or descriptive details. White, 496 U.S. at 332. In Roberson, this court recognized the importance of the corroboration of details and the value of predictive information, pointing out that in both Gates and White predictive and descriptive information was corroborated by police investigation prior to any seizure. 90 F.3d at 77, 79. Judge Becker concluded his analysis with an observation relevant to this case: "The tip in the case at bar contained no 'details of future actions of third parties ordinarily not easily predicted.' Thus, no future actions could be corroborated, and an important basis for forming reasonable suspicion was absent." Id. at 80 (internal citations omitted) (quoting White, 496 U.S. at 332). Here, too, the tip contained no details of future actions. Rather,

the prediction made--that the men the officers were looking
for would be found on the bus--consisted entirely of an
assumption: that the men on the bus were the ones the
officers were looking for. The van driver gave no basis for
this assumption, which was the key reason the officers acted.3
Indeed, whom the officers were looking for is something
that only the officers could know.

The Government argues that the lack of descriptive or
predictive information here is not fatal given the totality of
the circumstances.4 It contends the tip merely served to fill

---

3. The court states as fact that the van driver said he saw "two guys."
Supra at 4. However, the record, which on this point consists entirely of
the testimony of Sullivan, is not so clear. See  App. for Appellant at 33a
("[H]e stated to me: 'Officer, those guys you're looking for just got on that
bus up there.' "); id. at 52a ("[H]e says 'Officer, them two guys you're
looking for just got on that bus' . . . ."); id. ("[He] say[s]: 'Officer, the guys
you're looking for, they just got on that bus.' "); see also United States v.
Robertson, 81 F. Supp. 2d 579, 580 (E.D.Pa. 2000) ("[A] motorist came
by and informed [Sullivan] that the men he was looking for had boarded
a SEPTA bus . . . .").

4. It is important to remember that the circumstances in this case
include two men running toward the scene of the crime, at midday, in

20

in the last part of the puzzle: Where did the two suspects
go? While there may be cases that support this argument
in a general sense, the Government cites none where
officers relied, even in part, upon a tip so lacking in detail
as the one here. For example, in United States v. Allen, the
Tenth Circuit concluded that an anonymous tip was
sufficiently corroborated "[f]or the limited purpose of
establishing identity." 235 F.3d 482, 488 (10th Cir. 2000),
cert. denied, 121 S. Ct. 1643 (2001). However, the
informant in that case identified the suspect by name, and
described the suspect's physical stature and car. Id. at 485.
The tip here is utterly lacking in detail, and we should
"refus[e] to stretch Alabama v. White  any further."
Roberson, 90 F.3d at 80.

The Government also cites this court's recent decision in
United States v. Valentine, 232 F.3d 350 (3d Cir. 2000),
cert. denied, 532 U.S. 1014 (2001), to argue that the tip in
this case is not truly "anonymous" as that term is used in
cases such as J.L. and White, but rather deserves
additional credit because it was a face-to-face report. In
Valentine this court concluded that "officers had reasonable
suspicion after they received [a] face-to-face tip, were in a
high-crime area at 1:00 a.m., and saw Valentine and his
two companions walk away as soon as they noticed the
police car." Id. at 357. J.L. was distinguished on the basis
of the tip being face-to-face and because the officers "knew

---

metropolitan Philadelphia, cf. 4 Wayne R. LaFave, Search and Seizure,

S 9.4(g) at 206 (3d ed. 1996) ("[L]ess will suffice in the early morning hours when few persons are about than would be a basis for a stopping at high noon."), as well as an informant whose identity is unknown, cf. J.L., 529 U.S. at 270 (distinguishing anonymous tip from one where tipster "can be held responsible if her allegations turn out to be fabricated"); Roberson, 90 F.3d at 79 n.3 (distinguishing descriptions given by anonymous informants from those given by "identified witnesses"). See generally United States v. Jones, 998 F.2d 883, 885-86 (10th Cir. 1993) (concluding reasonable suspicion was not present in vehicle stop case where suspects were "in Albuquerque, a major population center, at 4:00 p.m. on a weekday," and the "information that the police were acting on came from an informant with whom they had no experience").

that the informant was reporting what he had observed moments ago." Id. at 354.

While it is true that "a tip given face to face is more reliable than an anonymous phone call," id. at 354 (citing cases), that proposition does not stretch so far as to provide reasonable suspicion here. In White, the Supreme Court stated that as a tip becomes more reliable, less information will be required to establish reasonable suspicion--it did not say that no information would be required. 496 U.S. at 330. The tipster in Valentine in fact provided a detailed description which the police matched before making the stop. 232 F.3d at 352-53. Furthermore, Valentine recognized that the reliability inferred from a face-to-face tip was not sufficient in and of itself: "The reliability of a tip, of course, is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account . . . ." Id. at 355. Here, the content of the van driver's tip contained nothing to support the speculative conclusion or assumption that the men he saw get on the bus were the ones Sullivan was chasing.

III.

While this court said in Valentine that "we are not going to second-guess the officers' decision to pursue the suspect immediately," 232 F.3d at 355, the officer in that case actually stopped the defendant only after he had received and corroborated descriptive information, id. at 352-53. Sullivan did not attempt to satisfy Terry with a quick question such as: "Were they running?" or "What were they wearing?" If the officers in Valentine had time to verify the tip in that case even though an armed gunman was involved, Sullivan could reasonably be expected to do the same here.5 A thorough analysis of the totality of the

---

5. The fact that Sullivan was confronted with the possibility of an armed criminal on a passenger bus does not change this conclusion. It is certainly not obvious that the best reaction to such a scenario is to pull over the bus with sirens blaring and lights flashing. Cf. J.L., 529 U.S. at 273 ("The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip

might be so great as to justify a search even without a showing of reliability.").

22

circumstances, as required by White and Gates, and as specifically focused by this court in Roberson , requires the conclusion that Terry was not satisfied.

I would reverse.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23