**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3220
_____

UNITED STATES OF AMERICA

v.

BRIAN GADSDEN,
Appellant
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 1-08-cr-00017-001)
District Judge:  Honorable Sylvia H. Rambo
_____

Argued January 11, 2011
_____

Before:  SCIRICA, BARRY and VANASKIE, Circuit Judges

(Opinion Filed: February 1, 2011)
_____

James V. Wade, Federal Public Defender
Frederick W. Ulrich, Assistant Federal Public Defender (Argued)
Office of Federal Public Defender
Suite 306
100 Chestnut Street
Harrisburg, PA 17101

*Counsel for Appellant*

Peter J. Smith, United States Attorney
Michael A. Consiglio, Assistant United States Attorney (Argued)
Eric Pfisterer, Assistant United States Attorney

Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, <u>Circuit Judge</u>.

Brian Gadsden pleaded guilty to a charge of possession of a firearm in furtherance of drug trafficking on the condition that he could appeal the District Court's denial of his motions to suppress evidence and an eyewitness identification. Because we conclude that the suppression motions were properly denied, we will affirm the Judgment of the District Court.

I.

As we write only for the parties, who are familiar with the facts and procedural history of this case, we will set forth only those facts necessary to our analysis.

On October 18, 2007, the United States Postal Service delivered a mysterious package to Allstar Auto, an auto supply business in Harrisburg, Pennsylvania. Over the course of that day, several people visited Allstar Auto to inquire about the parcel, the receipt of which was denied by Allstar Auto employees. The visitors threatened to "get the mailman on the route," and one individual brandished a gun. (A. 121.) It was later discovered that the package contained many pounds of marijuana.

2

On the morning of October 19, 2007, Angelica Matos, an employee of Allstar Auto who interacted with the individuals who inquired about the package, notified a local post office of the previous day's events, including the fact that a weapon had been brandished and some sort of threat had been made against the postal carrier who would have delivered the package. The post office relayed Matos's complaint to postal inspectors, who in turn contacted the Harrisburg Police Department for assistance. Victor Rivera, a Harrisburg detective who participated in the investigation, was told that at least two African-American individuals visited Allstar Auto regarding the package. One of the individuals might have been a woman. Detective Rivera was informed that a "red or burgundy vehicle," likely a Volvo, was one of the cars that the suspects drove. (A. 97.) Detective Rivera also remembered hearing about "a dark brown or maroon Jeep Cherokee." (A. 107.) A white minivan and a gray four-door Chrysler might also have been mentioned. (*Id.*) Detective Rivera was told that the individuals would return to Allstar Auto on October 19.

Joseph Corrado, a postal inspector who also participated in the investigation, was told the suspects drove a red or burgundy vehicle, a dark brown Jeep, and a white minivan. He believed a gray Chrysler might have been used as well. Inspector Corrado was informed that as many as five African-American males were involved. He did not recall being told a woman was one of the suspects. He was, however, told that the suspects would come back to Allstar Auto on October 19 to retrieve the package.

Postal inspectors and Harrisburg detectives drove in unmarked vehicles to Allstar Auto on October 19 to investigate. Inspector Corrado and another postal inspector drove

3

to Allstar Auto in Inspector Corrado's Chevy Blazer. Detective Rivera and other Harrisburg detectives drove in an unmarked burgundy Chevy Caprice that, according to Inspector Corrado, "scream[ed] law enforcement vehicle." (A. 123.) Both vehicles parked in the Allstar Auto parking lot. From there, Detective Rivera and Inspector Corrado observed a burgundy four-door Saturn parked across the street from the store. Brian Gadsden was in the passenger's seat, and his brother Reginald was standing approximately thirty yards away from the vehicle, talking on his cell phone. Both Gadsdens were watching Allstar Auto. When Reginald saw the unmarked vehicles, he slowly walked back to his car. Brian, still seated in the passenger seat, "opened the door, leaned down so you couldn't see him anymore, and then proceeded to close the door." (A. 98.) The Gadsdens then drove away.

At that point the detectives and the postal inspectors conferred briefly and agreed that they should follow the Gadsdens' vehicle. After trailing the Saturn for a short amount of time, the police initiated a traffic stop. The officers asked for and received the Gadsdens' photo identifications and detained them in police vehicles. While the Gadsdens were being held, Detective Rivera and other officers drove back to Allstar Auto and told Matos that they had stopped two individuals. They then drove her to the scene to identify the Gadsdens. The police did not show Matos the Gadsdens' ID cards before bringing her to the scene of the stop.

The police brought Matos to the Gadsdens in a vehicle with tinted windows. When Matos arrived, officers removed the Gadsdens from the police vehicle and Matos was driven to within approximately thirty feet from where the Gadsdens stood. She

4

positively identified the Gadsdens as the men who were at her store the day before, and the police placed them under arrest. Then, approximately seven hours after the initial traffic stop, the police searched the area where the Gadsdens had parked their car across the street from Allstar Auto and found a nine-millimeter semiautomatic pistol. The gun's caliber matched ammunition that was found in the Gadsdens' car.

On October 22, Inspector Corrado reviewed an Allstar Auto surveillance tape depicting Matos and her husband interacting with certain African-American males repeatedly over the course of October 18, during the daylight hours. Matos told Inspector Corrado that the individuals in the video were the men who were inquiring about the package of marijuana. According to Inspector Corrado, the individuals in the video were Brian and Reginald Gadsden.

The Gadsdens were subsequently indicted on drug and weapons charges. They sought to suppress the evidence police obtained as a result of the stop and search, as well as Matos's positive identification. Brian Gadsden also attempted to suppress his statements to police on the grounds that he was never given his *Miranda* warnings. The District Court held a suppression hearing at which Detective Rivera and Inspector Corrado testified. Matos, however, did not testify. The post office employee to whom Matos made her complaint also did not testify.

The District Court denied the motions to suppress. *United States v. Gadsden*, Nos. 1:CR-08-017-01, 1:CR-08-017-02, 2008 WL 794944 (M.D. Pa. Mar. 24, 2008). With respect to the traffic stop, the Court determined that the following facts gave rise to a reasonable suspicion: the Gadsdens were African-American men in a burgundy sedan

5

and appeared to be casing Allstar Auto on the same day Matos said the suspects would return to her store, and the Gadsdens drove away upon seeing the "unmarked, but ostensible police vehicles." *Id.* at *4. With respect to Matos's identification, the Court assumed without deciding that the identification was unnecessarily suggestive, but it found that there was no substantial likelihood of misidentification because Matos had ample opportunity to observe the Gadsdens, the identification happened within twenty-four hours of the initial encounter, and there was no evidence that Matos wavered in her identification of the Gadsdens. *Id.* at *5-6. Finally, the District Court determined that Brian Gadsden's claim that police failed to give him *Miranda* warnings was not credible. *Id.* at *6. After the Court denied the motions to suppress, Brian Gadsden pleaded guilty to a charge of possession of a firearm in furtherance of drug trafficking on the condition that he could appeal the denial of his suppression motions. The District Court sentenced him to sixty months' imprisonment, and he now appeals.[1]

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's denial of Gadsden's motions to suppress "for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (internal quotation marks omitted).

---

[1]Reginald Gadsden pleaded guilty to a charge of conspiracy to possess with intent to distribute marijuana and was sentenced to seventy-seven months' imprisonment. He appealed his sentence and we affirmed. *United States v. Gadsden*, No. 08-4366, 2011 WL 179621 (3d Cir. Jan. 20, 2011).

A.

Gadsden argues that the police unlawfully stopped his vehicle. He maintains that Matos's tip conveyed only that the suspects were African-American males. He emphasizes that the car the Gadsdens drove, a Saturn, was not among the cars identified to law enforcement officials. He also argues that the Gadsdens' conduct on the morning of October 19 did not justify a stop.

A police officer may initiate a brief investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), if he has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "[T]he 'reasonable suspicion' analysis is objective; subjective motive or intent is not relevant for *Terry* purposes." *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006). "To determine whether reasonable suspicion exists, we must consider the totality of the circumstances—the whole picture." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (internal quotation marks omitted). "'[R]easonable suspicion' is measured before the search; information acquired subsequent to the initial seizure cannot retroactively justify a *Terry* stop." *Goodrich*, 450 F.3d at 559. Conduct justifying a stop may be "ambiguous and susceptible of an innocent explanation." *Wardlow*, 528 U.S. at 125. "Courts give considerable deference to police officers' determinations of reasonable suspicion, and the cases are steadily increasing the constitutional latitude of the police to pull over vehicles." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citation omitted).

Gadsden has not shown that the District Court's factual findings are clearly erroneous. The District Court found that at the time of the *Terry* stop, law enforcement

7

officers had been told that at least two and up to five persons had been casing Allstar Auto and had been inquiring about a package to have been delivered through the postal service; at least two of the five individuals were African-American; a weapon had been brandished; a threat of some sort had been made against the postal carrier; the persons casing the store on October 18 said they would return the next day; and vehicles associated with the individuals included a red four-door sedan, possibly a Volvo. The District Court also found that when investigators arrived at Allstar Auto on the morning of October 19, "they saw a tableau that was similar, if not identical to the picture painted by the complaint filed that morning." *Gadsden*, 2008 WL 794944, at *4. Two black men, one inside and the other near a burgundy sedan, appeared to be watching Allstar Auto from across the street. The Gadsdens' behavior once the detectives and postal inspectors arrived at Allstar Auto further aroused the investigators' suspicion. Reginald Gadsden, who had been talking on a cell phone approximately thirty yards away from his car, slowly walked back to the Saturn while looking at the unmarked vehicles. Brian Gadsden, seated in the passenger seat, opened the door, crouched down so he could not be seen, and then closed the door.

Given the considerable deference accorded to police officers, who must make split-second judgments in dangerous contexts, we cannot say that the facts, as found by the District Court, were insufficient to support a reasonable suspicion that the Gadsdens were engaged in illegal activity. Accordingly, we will affirm the District Court's denial of Gadsden's motion to suppress evidence obtained as a result of the *Terry* stop.

B.

8

Gadsden also argues that the procedure that the police used to identify him was unnecessarily suggestive. He further maintains that because Matos did not testify at the suppression hearing, the District Court did not have a sufficient factual basis for determining that the procedure did not pose a substantial risk of misidentification.

Our assessment of an identification procedure contains two steps. "The first question is whether the initial identification procedure was unnecessarily or impermissibly suggestive." *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991) (internal quotation marks omitted). When determining whether a procedure is unnecessarily suggestive, we focus on "the suggestiveness of the identification, and . . . whether there was some good reason for the failure to resort to less suggestive procedures." *Id.* (emphasis and internal quotation marks omitted). Second, we ask "whether the procedure was so conducive to . . . mistaken identification or gave rise to such a substantial likelihood of . . . misidentification that admitting the identification would be a denial of due process." *Id.* (internal quotation marks omitted). In determining whether misidentification was likely, we consider the "totality of circumstances including: the witness's initial opportunity to view the suspect at the crime scene and degree of attention at that time, the witness's level of certainty in the disputed identification, the length of time between initial viewing and disputed identification, and the accuracy of any intervening description of the suspect occurring between those two events." *United States v. Mathis*, 264 F.3d 321, 330 (3d Cir. 2001).

The United States has conceded that the identification procedure in this case was suggestive. Like the District Court, we will assume, without deciding, that the procedure

9

used to identify Gadsden was *unnecessarily* suggestive. And, like the District Court, we conclude that the procedure used to identify Gadsden did not give rise to a substantial likelihood of misidentification. Inspector Corrado testified that the surveillance videotape showed that Matos had an opportunity to observe the Gadsdens, in the daylight, over the course of several hours. The District Court acted within its bounds in admitting Inspector Corrado's hearsay testimony that Matos identified the individuals in the surveillance video as the people who inquired about the package. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). The record contains no indication that Matos wavered in her identification. Fewer than twenty-four hours passed between Matos's initial interaction with the Gadsdens and her subsequent identification of them. And, while Matos provided only a general description of the Gadsdens in her complaint to the post office, her description was nonetheless accurate. Accordingly, the District Court properly denied Gadsden's motion to suppress Matos's identification.

C.

Finally, Gadsden argues that his statements to police should have been suppressed because they resulted from the allegedly illegal stop and identification. Having determined that the stop and identification were lawful, we conclude that Gadsden's statements should not have been suppressed.

III.

10

In sum, Gadsden's motions to suppress were properly denied.  Accordingly, we will affirm the Judgment of the District Court.