[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-15258
Non-Argument Calendar

_____

D.C. Docket No. 04-00073-CR-CO-W

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEITH AUGUSTUS JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Alabama

_____

(June 16, 2005)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

Keith Augustus Johnson pleaded guilty to possession of marijuana with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D), and possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Johnson's plea agreement "reserve[d] his right solely to appeal the adverse ruling on his pretrial Motion to Suppress which was filed by him on March 29, 2004." (R.1:28:6). Johnson exercises that right now, appealing his conviction on the basis that the drugs and gun found in his truck and his subsequent confessions were the products of an illegal search.

## I.

On October 20, 2003, Tuscaloosa County Sheriff's Deputy Thomas Hammonds was on patrol on Interstate 20/59 near Tuscaloosa, Alabama. While driving, Hammonds saw an eighteen-wheel truck cross the white line on the far right lane of the interstate and hit the "sleeper bumps" on the shoulder of the road. Hammonds continued to follow the truck for three miles, observing it cross the white line two more times. After the third time, Hammonds stopped the truck to determine if the driver was too tired or intoxicated to continue driving, and to issue the driver a ticket for violating Ala. Code § 32-5A-88(1), which prohibits a driver from unnecessarily swerving in and out of his lane.

2

Deputy Hammonds approached the drivers' side of the truck. He asked the driver, whom he soon learned was Johnson, for his driver's license and logbook. Looking into the truck, Hammonds noticed that the curtains to the sleeper area were drawn, which in his experience was unusual if the driver was the only person in the truck. Hammonds asked if there was anyone else in the truck with Johnson, and Johnson responded that there was not.

For his safety, in case Johnson was lying, Deputy Hammonds asked him to step out of the truck. Once Johnson was outside, Hammonds asked him where he had come from. Johnson said that he was coming from Toomsuba, Mississippi, which was inconsistent with the recording in the logbook. Hammonds then asked Johnson if he had any drugs, weapons, or cash over $10,000.00 in his truck. Johnson said he did not. Hammonds noticed that Johnson was particularly nervous during this question. He asked if he could search Johnson's truck. Johnson agreed.

Deputy Hammonds then went in the truck and looked behind the curtain into the sleeper compartment. Hammonds opened a closet off to the side of the sleeper area and pushed aside some quilts. There, he found what appeared to be a "brick" of marijuana wrapped in cellophane. Hammonds immediately stopped the search and called in a K-9 unit to check inside the truck. When the K-9 unit

arrived and alerted the officer that there were drugs in the truck, Hammonds placed Johnson under arrest.

Deputy Hammonds had another officer drive Johnson's truck to a nearby airport hangar to undergo a complete search of the cabin and the trailer. Hammonds drove Johnson to the airport. During the ride to the airport, Hammonds told Johnson that he could talk to an investigator at the hangar, but that he didn't want to talk to Johnson about what he had found. Johnson said that he was willing to cooperate and that this was the first time he had done anything like this.

At the airport, investigators found four guns in the sleeper compartment of the truck as well as eighteen pounds of marijuana. Investigator Severn Sanders of the Tuscaloosa Police Department read Johnson his <u>Miranda</u> rights in the hangar. Johnson orally waived his <u>Miranda</u> rights and told Sanders that he had received the marijuana and guns from "a guy in Arizona." He was delivering them to "an unknown person" in New York. Afterward, Johnson planned to return to Arizona to pick up another 200 pounds of marijuana.

Johnson was placed in the Tuscaloosa county jail. Hammonds gave him a ticket for swerving between lanes in violation of Ala. Code § 32-5A-88(1), which four days later was verified before a magistrate judge.

Meanwhile, on October 22, 2003, Johnson was again interviewed by Sanders and by an agent with the Bureau of Alcohol, Tobacco, and Firearms. Johnson was reminded of his <u>Miranda</u> rights, which he waived in writing. He told Sanders and the ATF agent that he had picked up the drugs from a man named Dwayne in Arizona and had been told to deliver them to a man in New York.

Based on the evidence seized from his truck and his confessions to Sanders, Johnson was indicted for one count of possessing marijuana with the intent to distribute it, and for one count of possessing a firearm in the course of drug trafficking. Johnson moved to suppress both the search of his truck and his confessions. The magistrate judge, in his twelve-page report and recommendation, denied Johnson's motion to suppress the evidence, and the district court adopted the magistrate's report and recommendation in full.

Johnson then pleaded guilty to both counts in the indictment. However, he reserved the right to appeal the denial of his motion to suppress.

## II.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." <u>United States v. Zapata</u>, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's findings of fact to be true, unless they are shown to be clearly erroneous, and we review the district court's application of the law to

those facts de novo.  Id.  "[A]ll facts are construed in the light most favorable to the prevailing party below."  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).

Johnson first contends that Deputy Hammonds' initial stop of his truck lacked probable cause and was, therefore, unconstitutional.  He argues that he did not violate Ala. Code § 32-5A-88(1), the statute that prohibits swerving in and out of one's lane while driving.  It does not matter whether he did or not.  While Johnson's violation of the lane-swerving statute was one reason that Deputy Hammonds stopped him, a second reason was that Hammonds was concerned that Johnson was sleeping or intoxicated.  This, we have held in almost identical circumstances, is sufficient justification to stop a motorist.  United States v. Harris, 928 F.3d 1113, 1116–17 (11th Cir. 1991) (finding that a law enforcement officer who saw a driver swerve into the emergency lane twice "was justified in stopping and detaining [the defendant] to determine whether he was drunk or falling asleep at the wheel").[1]

---

[1] Johnson also argues that the ticket issued by Deputy Hammonds was invalid because it was not verified by a state magistrate within forty-eight hours of issuance, as required by Alabama law.  However, as we noted above, even without the ticket the traffic stop of Johnson's truck was valid because Hammonds observed Johnson serve in and out of his lane three times, and was, therefore, worried that Johnson was drunk or asleep.

In addition, we agree with the magistrate judge that Alabama courts have held that the forty-eight hour verification rule is a "ministerial requirement" for the police, and does not give the defendant a substantive right to invalidate his ticket.  See, e.g., Lawrence v. States, 601 So.

6

## III.

Johnson next contends that Deputy Hammonds detained him at the traffic stop for an unreasonable amount of time, in violation of the Fourth Amendment. He argues that the time between the traffic stop and when Hammonds received Johnson's consent to search the truck was "an unconstitutional prolonged detention."

"Under Terry v. Ohio, an officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968)). The stop must be of "limited duration," and may not last "any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." Id. (citation omitted). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). However, where the initial traffic stop is legal, the officer has "the duty to investigate suspicious circumstances that then [come] to his attention." Harris, 928 F.2d at 1117.

---

2d 194, 195 (Ala. Crim. App. 1992) ("[The verification rule] is a rule of accountability for each ticket issued to a law enforcement agency. It does not give the defendant a substantive right to have the [ticket] verified within 48 hours.").

In Harris, the defendant challenged the detention following his traffic stop for twice swerving in and out of the emergency lane. During the traffic stop, the law enforcement officer who had observed the defendant swerving had noticed that the defendant: "(1) [was] driving a rental car with a restricted license; (2) [was] 'shaking' and acting 'extremely nervous'; and (3) gave conflicting responses as to where he had been." Id. We held that "[u]nder these circumstances, where [the officer] acted on reasonable suspicion and only detained Harris for a short period of time . . . [the defendant]'s detention did not violate the fourth amendment's prohibition against unreasonable seizures." Id.

In this case, Deputy Hammonds testified that: (1) Johnson's account of his last stop was different from the notation in his logbook; (2) the curtains to the sleeper cab were drawn, which was unusual for a truck driver driving alone; and (3) Johnson was "extremely nervous" when asked whether he had illegal drugs in the truck. Like the Harris Court, we find that this is sufficient articulable suspicion of illegal activity for Hammonds to detain Johnson for a short time before he asked for, and received, Johnson's consent to search the truck.[2]

---

[2] Johnson also contends that there was insufficient evidence that he consented to the search of his truck. The magistrate judge found as fact that "Hammonds asked [Johnson] for permission to search the vehicle. [Johnson] said that he could search." (R.1:22:2). Other than noting that Deputy Hammonds' account of the stop is the only evidence in the record that Johnson consented to the search, Johnson offers nothing, including his own testimony, to dispute this account. He, therefore, cannot show that the magistrate judge's finding was clearly

## IV.

Johnson's third contention is that Deputy Hammonds, while transporting Johnson to the airport hangar, "deliberately elicited talking from [him] without warnings of his right to counsel."

Miranda warnings must precede any "custodial interrogation." Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). In this case, there is no dispute that Johnson was in custody when he made the first incriminating statement in Deputy Hammonds' vehicle while Hammonds was transporting him to the airport hangar. The sole issue is whether Johnson was under interrogation at the time.

In Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1979), the Supreme Court defined interrogation as "express questioning" or "any words or actions on the part of police (other than those normally attendant to arrest and custody) that police should know are reasonably likely to elicit an incriminating response from the suspect." Voluntary and spontaneous comments are admissible, even if given after Miranda rights are asserted, as long as the

---

erroneous, especially given that "[t]he individual challenging the search has the burden of proof and persuasion" with regard to the search's illegality. See United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

9

comments were not made in response to government questioning. Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991).

Johnson was not being "interrogated" when he made the statement in Deputy Hammonds' car. Hammonds testified that, during the transport, he told Johnson "that he could talk to an investigator when we got there; that I didn't want to talk to him about what we had found." (R.2:11). Johnson then made the incriminating statement at issue. Hammonds' comment to Johnson was not reasonably likely to elicit an incriminating response from Johnson. In fact, the opposite is true.

## V.

Johnson's final contention is that his confession to Investigator Sanders was unconstitutional because he did not understand his Miranda rights. Specifically, Johnson seizes on Sanders' testimony that the purpose of the second interrogation on October 22, 2003 was to "make sure [Johnson] understood his rights." According to Johnson, this proves that Sanders was unsure that Johnson had understood his rights as explained orally during the first interrogation at the airport hangar.

Johnson's argument ignores the more salient part of Investigator Sanders' testimony. The following exchange between the magistrate judge and Sanders is instructive:

> Court: You didn't say this, but I want to make sure it's clear. When you're talking about a lawyer, did you also tell [Johnson] on October 20th, that if you cannot afford a lawyer that one would be appointed for him by the Court.
> Sanders: That's correct. Yes, sir.
> Court: In other words, did you go through the entire Miranda rights?
> Sanders: Yes, I did. I had it on a card.
> . . . .
> Court: Was there any doubt in your mind, on October 20th [at the airport hangar], when you informed [Johnson] of his rights, whether or not he understood it?"
> Sanders: No. No doubt at all. I mean, he understood 100 percent.

(R.2:53).

Sanders testified that he read Johnson his Miranda rights. Sanders also testified that there was "no doubt" that Johnson "understood 100 percent" his Miranda rights. This testimony was undisputed by Johnson. After hearing all the testimony at the suppression hearing, the magistrate judge found that Johnson "waived his rights and told Sanders that he received the marijuana and guns 'from a guy in Arizona.'" (R.1:22:3). Absent any evidence to the contrary, we cannot say that the magistrate judge's finding was clearly erroneous.

**AFFIRMED**.

11