

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-11-2007

# USA v. Kemp

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4211

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Kemp" (2007). *2007 Decisions*. Paper 1779.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1779

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4211

———

UNITED STATES OF AMERICA

v.

RODNEY KEMP,

Appellant

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 04-657)
District Judge: Honorable Freda L. Wolfson

———

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 13, 2006

Before: FUENTES and VAN ANTWERPEN, <u>Circuit Judges</u>, and PADOVA,*
<u>District Judge</u>.

(Filed January 11, 2007)

———

OPINION OF THE COURT

———

————————

*The Honorable John R. Padova, District Judge of the Eastern District of Pennsylvania,
sitting by designation.

PADOVA, <u>District Judge</u>.

Appellant Rodney Kemp was convicted by a jury on May 18, 2005, of one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) & (2). On September 1, 2005, the District Court sentenced Kemp to a term of 29 months of imprisonment. On appeal, Kemp contends that the District Court erred in denying his pretrial motion to suppress evidence resulting from an alleged illegal search and seizure. We have jurisdiction pursuant to 28 U.S.C. § 1291. We will affirm.

I.

On February 7, 2004, at approximately 1:05 a.m., Mark Buehler, a police officer with the Cherry Hill Police Department for almost 10 years, was on routine patrol when he observed a gold-colored Lincoln Town Car, driven by Kemp and traveling east-bound on Park Boulevard in Cherry Hill Township. According to Buehler, he was approximately 30 to 40 yards directly behind Kemp's car when he noticed that one of its tail lights was broken. Buehler recognized that a cracked tail light is a violation of the New Jersey Motor Vehicle Code. Kemp, however, denies that his tail light was cracked or broken. Buehler initiated a traffic stop and Kemp's car came to a stop at the Parkview Motel. Buehler testified that during the previous 10 years, he witnessed multiple arrests for prostitution, narcotics, and weapon offenses at the Parkview Motel, and that he had a heightened sense of awareness as a result of being in a high-crime area that was not well-lit, and because the location was not easily accessible to other patrol vehicles. Buehler testified that as he was exiting his vehicle,

2

he observed Kemp slump down onto the passenger seat at least two or three times, and he noticed two women seated in the back seat of Kemp's vehicle.

Sergeant Kevin Wright, a police officer with the Cherry Hill Police Department for 14 years, observed Buehler initiate the traffic stop of Kemp's car and pulled behind Buehler's vehicle. Wright testified that he also observed that Kemp's driver's side tail light was cracked.

Buehler approached Kemp's car on the driver's side, and Wright approached on the passenger side. Buehler asked Kemp for his license, registration, and insurance documentation. Buehler testified that he had difficulty seeing the front seat and the floor of Kemp's car because there was trash and paperwork throughout the car's interior, and because Kemp was wearing a large jacket and kept turning to his side. Buehler further testified that when Kemp turned to the side, he could not see Kemp's hands, and did not know what Kemp was doing. Buehler instructed Kemp to stop moving two or three times because he was concerned for his safety and wanted to make sure that Kemp was not trying to conceal something. According to Buehler and Wright, Kemp initially complied with each request, but then went back to what he was doing. Wright also testified that Kemp was extremely anxious while he was seated in his car, that he kept turning around and checking something to his side, that he adjusted something in his pocket at least three times, and that he kept looking down to the pocket area on his jacket. Buehler asked Kemp the names of the two women in the back seat. Kemp was unable to answer. Buehler testified that, during this

3

questioning, Kemp was argumentative and would not listen to his instructions, and the tone of Kemp's voice became increasingly loud. However, Kemp testified that he did not raise his voice at the officers. Buehler testified that because of Kemp's erratic behavior and non-compliance with his questioning, he instructed Kemp to step out of the vehicle.

According to Buehler, as Kemp stepped out of the car, Kemp stuck his hand into his pocket. Buehler testified that he ordered Kemp to take his hand out of his pocket and that initially Kemp did so. Kemp, however, testified that his hands were at his side when he exited the car, that he did not "go for [his] pocket" at any time, and that the police officer did not tell him to keep his hands away from his pockets. Buehler testified that Kemp began to take several steps towards him and attempted to put his hand back in his pocket. Buehler also observed a black convenience-store style bag in Kemp's pocket. Buehler testified that he had prior knowledge that such bags are used for narcotics and other criminal contraband. Wright also testified that he observed a bulge, consistent with a weapon, in Kemp's jacket pocket, and a black plastic convenience-store bag coming out of the jacket pocket. Wright testified that his concern for his safety was very high due to Kemp's actions, his apparent focus on his jacket pocket, and his agitation. Wright observed Kemp attempt to place his hand into the jacket pocket containing the bulge. Wright testified that he told Kemp to keep his hands out of his pockets, but that Kemp immediately put his hand in his pocket, and replied that "there is nothing in here."

According to Buehler, Wright then approached Kemp from behind, and reached

forward to touch Kemp's pocket. Kemp then "clinched down on the pocket with his elbow," and "lower[ed] his stance in an aggressive manner." Wright then grabbed Kemp's right wrist and pulled Kemp's hand away from the pocket, while Buehler grabbed Kemp's left wrist. Buehler testified that Kemp struggled and kicked, and attempted to reach back into his jacket pocket. Kemp denies that he kicked, pushed, or touched the officers in any way. Buehler and Wright, while maintaining control of Kemp's arms, brought him to the rear of the car. Wright testified that Kemp did not willingly go to the rear of the car, and that Kemp was extremely agitated and screaming. Wright testified that Officer Timothy Tedesco arrived at the scene, and upon Wright's instruction, removed the object from Kemp's right jacket pocket. Tedesco informed Buehler and Wright that it was a gun. Kemp was placed under arrest and transported to the Cherry Hill Police Station. Kemp's car was towed and impounded.

Kemp testified that, prior to picking up the two women who were in his car at the time of this incident, he gave a ride to two men who left a bag on the back seat of his car. Kemp further testified that he put the bag into his pocket without looking into it. According to Kemp, he provided Buehler with his documentation, and then proceeded to wait in the car for 10 to 15 minutes, until the police officers asked him to exit the car and walk to the back of the vehicle. Kemp testified that the police officers threw him on the car and went into his pocket.

On February 7, 2005, Kemp filed a motion to suppress evidence seized from him at

the time of his arrest. The District Court held suppression hearings on March 3, 2005 and April 22, 2005. Kemp's counsel acknowledged during the evidentiary hearings that there were no pictures or records indicating the condition of Kemp's car at the time of the incident. The District Court denied the motion on May 3, 2005. A jury convicted Kemp of possession of a weapon by a convicted felon on May 18, 2005. This appeal followed.

## II.

This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts. United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002) (citing United States v. Riddick, 156 F.3d 505, 509 (3d Cir. 1998)). Consequently, a district court's conclusions regarding reasonable suspicion are subject to plenary review. United States v. Robertson, 305 F.3d 164, 167-68 (3d Cir. 2002).

## III.

Kemp first argues that the police lacked probable cause to conduct a stop of his vehicle and, therefore, any evidence obtained as a result of this unlawful stop should be suppressed. Kemp notes that the Government's justification for the stop was the supposed presence of a broken tail light. However, Kemp argues that Buehler's assertion that Kemp's tail light was broken was not corroborated by any other evidence, such as photographs of the vehicle, to show that the tail light was indeed broken. Kemp further argues that Buehler's testimony, viewed as a whole, lacks credibility. Therefore, Kemp contends that the District

Court erred when it credited Buehler's testimony and accepted as fact that the tail light was broken.

The question of whether the tail light was broken is a question of fact which we review for clear error. Perez, 280 F.3d at 336. Under the clear error standard, we will uphold a district court's factual findings unless they "(1) [are] completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bear[] no rational relationship to the supportive evidentiary data." United States v. Antoon, 933 F.2d 200, 204 (3d Cir. 1991) (quoting Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972)). The District Court's factual finding that Kemp's tail light was broken is supported by the evidence. The District Court properly credited the testimony of Buehler, which was corroborated by the testimony of Wright. See United States v. Voight, 89 F.3d 1050, 1080 (3d Cir. 1996) (holding that it is not the role of the appellate courts to weigh the credibility of witnesses). Therefore, Kemp's contention that the traffic stop of his vehicle was unlawful due to a lack of probable cause is without merit.

Kemp next argues that, even if the stop was lawful, the police had no right to conduct a Terry frisk as they lacked grounds to believe that he was armed and dangerous. In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court created a narrowly drawn exception to the rule that warrantless searches are presumptively unreasonable by allowing a police officer to conduct a brief investigatory search without a warrant. A police officer may conduct such a stop "only if the officer can 'point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion.'" Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003) (quoting Terry, 392 U.S. at 21). The Court also recognized in Terry that an officer making a reasonable investigatory stop should have the opportunity to protect himself from attack by a hostile suspect. Adams v. Williams, 407 U.S. 143, 146 (1972) (citing Terry, 392 U.S. at 24). Therefore, when making a Terry stop, an officer is permitted to make a limited protective search for concealed weapons when the individual gives the officer reason to believe he or she may be armed and dangerous. Id. (citing Terry, 392 U.S. at 30).

Buehler and Wright had reasonable suspicion that Kemp was armed and dangerous, and, therefore, they were justified in conducting a protective search for weapons. Buehler and Wright pointed to specific and articulable facts, which taken together with rational inferences from these facts, reasonably warranted the protective search. The traffic stop occurred in a high-crime area that was not well-lit and not easily accessible to other patrol vehicles. Buehler observed Kemp slump down onto the passenger seat at least two or three times after he pulled over Kemp's vehicle. Kemp kept turning to his side. Kemp, though he initially followed Buehler's commands to stop moving, continued moving to his side, was argumentative, and became increasing loud. Kemp put his hand in his jacket pocket after he stepped out of the car and, although he removed it when asked, he stepped toward Buehler and put his hand back in his jacket pocket. In response to Wright's demand that Kemp keep his hands out of his pockets, Kemp immediately put his hand in his pocket and replied, "there

is nothing in here," which the officers knew was untrue based on their observations. Under the totality of these circumstances, there was reasonable suspicion that Kemp was armed and dangerous, and therefore, Buehler and Wright were justified in conducting a protective search for weapons.

Finally, Kemp argues that if the police had authority to conduct a protective weapons search, the police exceeded the permissible scope of a such a search and, instead, conducted a full search and seizure. Kemp argues that the officers exceeded the scope of Terry by forcibly restraining him, removing him to the rear of the car, and reaching into his pocket to remove an object without first conducting a pat-down of the outer layer of his clothing.

During a Terry stop, officers may take additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). Buehler and Wright acted in a reasonable manner in using a moderate amount of force to physically restrain Kemp so that they could continue their investigatory stop because they reasonably suspected Kemp was armed; Kemp repeatedly disobeyed orders from the officers to keep his hands in view and not to reach into his jacket pocket; and, when Wright attempted to conduct a pat-down, Kemp took a defensive stance and clenched down on the pocket where the officers suspected a weapon to be located.

Additionally, the officers did not exceed the scope of Terry when Tedesco reached into Kemp's pocket. A search conducted pursuant to a Terry stop must be limited in scope

9

to its protective purposes. Adams, 407 U.S. at 146. Generally, a protective search consists of a pat-down of the exterior clothing of a detained individual. Terry, 392 U.S. at 21; Sibron v. New York, 392 U.S. 40, 65 (1968) (noting that protective searches will typically be confined to "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault"). However, the Supreme Court has also held that, in the context of a Terry stop, a police officer's reaching into the particular spot where a gun was thought to be hidden constituted a limited intrusion designed to insure the officer's safety and was reasonable. Adams, 407 U.S. at 148. In Adams, the police officer, in the process of conducting a Terry stop, reached into a car and removed a gun from an individual's waistband. Id. Here, the police officers had a reasonable suspicion that Kemp was armed and that the weapon was located in Kemp's right jacket pocket. As in Adams, rather than conducting a full pat-down, the officers conducted a more limited search by going directly to the area that they reasonably suspected contained a weapon. Consequently, reaching into Kemp's pocket to retrieve what the officers suspected to be a weapon was a permissible Terry search, and the officers' conduct did not violate the Fourth Amendment.

For the foregoing reasons, we will affirm Kemp's conviction.