**UNITED STATES OF AMERICA and the PEOPLE OF THE VIRGIN ISLANDS, Plaintiffs**

**v.**

**RUPERT WALTERS, JR., Defendant**

Criminal No. 2008-31

District Court of the Virgin Islands

Division of St. Thomas and St. John

August 1, 2008

456

EVERARD E. POTTER, AUSA, St. Thomas, USVI, *For the plaintiffs.*

JESSE A. GESSIN, AFPD, St. Thomas, USVI, *For the defendant.*

GÓMEZ, *Chief Judge*

## MEMORANDUM OPINION

### (August 1, 2008)

Before the Court is the motion of the defendant, Rupert Walters, Jr. ("Walters"), to suppress physical evidence and statements.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court held a hearing on Walters' motion on July 14, 2008. At that hearing, the government called two witnesses, the first of whom was Sergeant Clayton Brown ("Brown"), a fourteen-year veteran of the Virgin Islands Police Department. Brown testified that at approximately 5:00 p.m. on April 14, 2008, he and four other officers responded to an anonymous telephone tip that several young men were smoking marijuana at Nature's Nook, a fruit stand in Cruz Bay, St. John, U.S. Virgin Islands. Brown stated that the fruit stand had been out of business for a few months and that a hand-painted "No Loitering" sign had been posted outside by the stand's owner.

On approaching the fruit stand, Brown and Officer Derrick Callwood ("Callwood") observed a group of men[1] under the roof of the fruit stand. Callwood observed Walters standing in the middle of the men. Brown and Callwood both detected what they believed to be the odor of marijuana. Callwood also observed an individual holding what appeared to be a marijuana cigarette.[2] As the officers neared the group of men, Brown saw many of the men throw to the ground what Brown perceived to be smoking paraphernalia, such as rolling papers.

One of the officers ordered the men to put their hands against the wall. Thereafter, Brown and Callwood noticed one of the men — who turned

---

[1] The testimony reflects that there were six to ten men congregated at the fruit stand.

[2] Callwood stated that the individual he observed smoking marijuana was not Walters.

out to be Walters — start walking away from the premises. Brown extended his arm and told Walters not to leave. According to Brown, Walters replied that he could not be searched and that he had just arrived at the fruit stand. Brown asked Walters if he had any sharp objects on his person. Walters answered in the negative. Brown thereafter patted Walters down for officer safety and felt in Walters' pants pocket a hard object that Brown believed to be a firearm. Brown immediately yelled, "gun, gun." At that moment, Brown turned Walters over to Callwood.

Callwood patted Walters down for officer safety and found a firearm and a speed loader in Walters' pants pockets.[3] Callwood then asked Walters whether he had a license to possess the firearm. Walters responded in the negative. At that point, Callwood read Walters his *Miranda* rights and escorted him to the nearest police station. At the station, Callwood again advised Walters of his *Miranda* rights. Callwood made no further inquiries of, or comments to, Walters. Walters subsequently stated on his own initiative that he had found the firearm in the garbage.

Walters was indicted on one count of possession of a firearm in a school zone, in violation of Title 18, Section 922(q)(2)(A) of the United States Code, and one count of unauthorized possession of a firearm, in violation of Title 14, Section 2253(a) of the Virgin Islands Code.

Walters now seeks to suppress any statements and physical evidence.

## II. ANALYSIS

■■ The Fourth Amendment prevents "unreasonable searches and seizures." U.S. CONST. amend. IV. A seizure is usually reasonable when it is carried out with a warrant based on probable cause. *Katz v. United States*, 389 U.S. 347, 356-357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Warrantless searches are presumptively unreasonable. *See id.* As an exception to this rule, a police officer may conduct a brief, investigatory search consistent with the Fourth Amendment without a warrant under the "narrowly drawn authority" established for a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Such warrantless searches are appropriate where an officer possesses reasonable, articulable

---

[3] Walters was also found in possession of small plastic bags containing what Callwood described as a green, leafy substance.

suspicion that criminal activity is afoot. *Id.*; *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

██ ██ Reasonable suspicion "is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). Thus, because probable cause means "a fair probability that contraband or evidence of a crime will be found," the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content than that required for probable cause. *Id.*; *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). However, the officer must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 27). A police officer, therefore, may only conduct a *Terry* stop where "specific and articulable facts, together with all their rational inferences, suggest that the suspect was involved in criminal activity." *United States v. Robertson*, 305 F.3d 164, 168 (3d Cir. 2002) (quoting *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998)). Consequently, courts "accord deference to an officer's judgment of whether criminal activity is taking place with an understanding that 'whether an officer has reasonable suspicion to warrant a stop . . . is often an imprecise judgment.'" *United States v. Ramos*, 47 V.I. 755, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *Robertson*, 305 F.3d at 168).

██ Here, the officers were investigating a group of congregated men who were allegedly involved in illegal drug activity. The location of the officers' investigation was in an area the officers knew to be, based on their many years of experience, a high-crime area. Indeed, testimony at the hearing reflects that the officers had previously investigated marijuana use, in particular, at or near that location. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)), "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 145, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)); *see also Brown*, 159 F.3d at 149-50 (noting the relevance of an area's reputation for criminal activity). Thus, the reputation of the area surrounding

Nature's Nook as a place where people congregate to smoke marijuana or engage in other criminal activity is one articulable fact on which the officers could legitimately have relied in conducting the stop. *See, e.g., United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006).

██ ██ On arrival at the scene, the officers perceived the odor of what they believed to be marijuana. That perception, based on the officers' knowledge and experience, provided additional support for the officers' reasonable suspicion that criminal activity was afoot. Here, as in the Third Circuit's decision in *Ramos*, the Court is persuaded that the officers' detection of marijuana and observation of its use, coupled with the other circumstances in this case, provided sufficient particularity to stop Walters. Walters points to no authority to support his apparent contention that the Court should apply the stricter particularity requirement that probable cause calls for, even though the Court's finding is based on reasonable suspicion. *Cf. Ramos*, 443 F.3d at 309 n.6 ("As defendants point out, courts that have addressed the particularity requirement in the context of marijuana odor have established that the odor should be particularized to some specific person or place. However, these cases all addressed the particularity requirement in the context of a probable cause inquiry.") (citation omitted).

Moreover, while the officers did not specifically observe Walters smoking marijuana or throwing marijuana paraphernalia to the ground, the Court is convinced that Walters' unilateral separation from the group by walking away and spontaneous statements, discussed below, gave the officers whatever particularized suspicion Walters urges is necessary. *See, e.g., United States v. French*, 974 F.2d 687, 692 (6th Cir. 1992) (holding that there was reasonable suspicion to stop suspects who had been riding "in tandem" with a truck from which a marijuana odor was emanating); *see also United States v. Simpson*, 259 Fed. Appx. 164, 166 (11th Cir. 2007) (unpublished) (noting "that when the officers approached the house, they smelled a strong odor of burning marijuana coming from inside the house"), *cert. denied*, 128 S. Ct. 1910, 170 L. Ed. 2d 774 (2008); *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (concluding that the smell of marijuana emanating from a motor home during a traffic stop sufficed to form the reasonable suspicion necessary to justify the detention of the driver and the passenger); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) ("The indications that [the defendant]

might be involved with drugs [were] enhanced by the strong marijuana smoke odor in his vehicle . . . .").

■ Furthermore, both Brown and Callwood testified that as the officers approached Nature's Nook, they observed Walters — who was in the midst of the group of individuals — begin walking away from the premises. Although simply walking away from the police does not give rise to reasonable suspicion, *see Wardlow*, 528 U.S. at 125; *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000), *cert. denied*, 532 U.S. 1014, 121 S. Ct. 1748, 149 L. Ed. 2d 670 (2001), "it is a factor that can be considered in the totality of the circumstances." *Valentine*, 232 F.3d at 357 (concluding that officers had reasonable suspicion where, *inter alia,* they "saw [the defendant] and his two companions walk away as soon as they noticed the police car"); *see also United States v. Hunter*, 291 F.3d 1302, 1306-07 (11th Cir. 2002) (finding reasonable suspicion where the defendant was located in an area with a reputation for high crime and walked away from illegal activity upon arrival of the police), *cert. denied*, 537 U.S. 1064, 123 S. Ct. 612, 154 L. Ed. 2d 550 (2002).

■ Finally, after Brown told Walters to remain at the scene, Walters, unbidden, stated that he could not be searched and that he had only just arrived. Those statements could reasonably have led the officers to believe that Walters was nervous or being evasive. *See, e.g., United States v. Kemp*, 214 Fed. Appx. 127, 132 (3d Cir. 2007) (not precedential) (affirming the denial of a suppression motion and noting that the defendant stated, "there is nothing in here," while putting his hand in his pockets); *United States v. Ray*, 145 Fed. Appx. 642, 646 (11th Cir. 2005) (not for publication) (noting that the defendant's pre-pat-down suspicious statement, " 'these ain't my pants, these are my cousin's pants[,]' . . . created a reasonable belief [the defendant] may have been carrying a weapon on his person"); *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (noting that suspicious statements "may give rise to reasonable suspicion of criminal activity"); *cf. United States v. Jaramillo*, 25 F.3d 1146, 1153 (2d Cir. 1994) (finding no reasonable suspicion where, among other things, the defendant had not "made any suspicious statements").

In short, the Court finds that the totality of the circumstances gave the officers reasonable suspicion to detain Walters under *Terry*.[4]

During a *Terry* stop, law enforcement officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo.' " *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)). Thus, officers may conduct a limited pat-down if they "[are] justified in believing that the individual whose suspicious behavior [they are] investigating at close range is armed and presently dangerous to the officer[s] or to others." *Terry*, 392 U.S. at 24. The *Terry* Court further explained that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

In this matter, the officers testified that they feared for their safety because of their knowledge that the area in which they encountered Walters was reputed for its criminal activity. The officers further testified that Walters began walking away from the group of individuals whom the officers observed to be engaging in illegal drug use. Finally, when told to stay put, Walters expressly told officers not to search him. The Court finds that these several facts, as well as all rational inferences drawn from these facts, would have led a man of reasonable caution to believe that Walters may have been armed and dangerous. The officers were therefore justified in frisking Walters.

In addition, the officers did not exceed the scope of *Terry* when Callwood reached into Walters' pockets. Although a protective search

---

[4] Walters argued neither in his motion nor at the suppression hearing that he was in custody when asked if he had a license to possess a firearm. Without dwelling on the issue, the Court finds that Walters was not in custody at that time. The stop took place during the daytime and next to a public road with several people passing by. There is no evidence that the officers physically restrained Walters beyond patting him down for safety reasons, spoke to him in harsh or coercive tones, or warned him that he might be taken to a police station. In short, Walters was not "restrained to the degree associated with formal arrest." *See, e.g., United States v. Killingsworth*, 118 Fed. Appx. 649, 651 (3d Cir. 2004) (unpublished). As a consequence, Walters was not in custody for *Miranda* purposes when he answered the officers' question whether he had a license to possess a firearm. *See, e.g., United States v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006) (concluding that because the defendant was not in custody, "[o]f course, in these circumstances *Miranda* is not implicated"), *cert. denied*, 547 U.S. 1208, 126 S. Ct. 2902, 165 L. Ed. 2d 919 (2006).

generally involves a pat-down of the outer clothing of a detained individual, *Terry*, 392 U.S. at 21; *Sibron v. New York*, 392 U.S. 40, 65, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) (noting that protective searches will typically be confined to "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault"), "the Supreme Court has also held that, in the context of a *Terry* stop, a police officer's reaching into the particular spot where a gun was thought to be hidden constituted a limited intrusion designed to insure the officer's safety and was reasonable." *Kemp*, 214 Fed. Appx. at 132 (citing *Adams*, 407 U.S. at 148).

 Here, the officers reasonably believed that Walters had a gun based on their initial pat-down, and could therefore expand their inquiry to determine what dangerous object they reasonably believed to be in Walters' pants pocket. *See, e.g., United States v. Harris*, 313 F.3d 1228, 1237 (10th Cir. 2002) (affirming the denial of the defendant's suppression motion and noting that after the officer had felt a bulge in the defendant's boot that he believed to be a gun, he "had the right to investigate further by lifting up Defendant's pantleg so that he could reach inside the boot"), *cert. denied*, 537 U.S. 1244, 123 S. Ct. 1380, 155 L. Ed. 2d 217 (2003). Accordingly, the physical evidence seized from Walters will not be suppressed.

Walters also seeks to suppress any statements he made to the officers. The testimony at the suppression hearing reflects that Walters made three statements.

 Walters' first statement — that he could not be searched — will not be suppressed because Walters uttered that statement spontaneously and voluntarily before any question was asked of him. *See United States v. Williams*, 16 Fed. Appx. 90, 92 (4th Cir. 2001) (unpublished) ("[I]t is also well settled that spontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by *Miranda*, even if the defendant is in custody when the statements are made.") (citing *Rhode Island v. Innis*, 446 U.S. 291, 299-301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993)), *cert. denied*, 534 U.S. 938, 122 S. Ct. 311, 151 L. Ed. 2d 231 (2001); *see also United States v. Johnson*, 136 Fed. Appx. 279, 283 (11th Cir. 2005) (not for publication) ("Voluntary and spontaneous comments are admissible, even if given after *Miranda* rights are asserted, as long as the comments were not made in response to government

questioning.") (citing *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991)).

 Furthermore, because Walters was subject to a valid *Terry* stop, the officers were entitled to ask him questions "as long as the[y] . . . d[id] not convey a message that compliance with their requests [was] required." *See Florida v. Bostick*, 501 U.S. 429, 435, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). The record in this matter does not suggest that any such message was conveyed. Indeed, the credible and unrebutted testimony at the suppression hearing indicates that Walters voluntarily answered the officers' question about whether he was licensed to possess a firearm. *See, e.g., United States v. Francis*, 140 Fed. Appx. 184, 187 (11th Cir. 2005) (not for publication) (concluding that the defendant was not in custody where the record showed that he had "voluntarily consented to answer the officer's questions"), *cert. denied*, 546 U.S. 1045, 126 S. Ct. 764, 163 L. Ed. 2d 593 (2005). The Court further finds that the officers' relatively brief detention of Walters was reasonably tailored to dispel any suspicions the officers may have had concerning Walters' potential involvement in criminal activity, that is, whether Walters possessed a firearm in violation of statute. *See, e.g., United States v. Scheets*, 188 F.3d 829, 838 (7th Cir. 1999) (finding that the officers' questions "were specifically tailored to establish [the defendant's] identity and either to confirm or dispel the officers' suspicions regarding [the defendant's] involvement in the bank robbery") (citation omitted), *cert. denied*, 528 U.S. 1096, 120 S. Ct. 837, 145 L. Ed. 2d 703 (2000). Accordingly, because the officers permissibly asked Walters whether he had a license to possess a firearm and Walters voluntarily answered, Walters' answer to that question will not be suppressed.

 Once Walters answered the officers' question about his unlicensed possession of a firearm in violation of statute, the officers had probable cause to believe that Walters had committed a crime. *See, e.g., United States v. Muhammad*, 120 F.3d 688, 696 (7th Cir. 1997) ("Probable cause [to arrest] exists when at the moment an arrest is made officers have 'facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information' that would sufficiently 'warrant a prudent man in believing that the [suspect] had committed or was committing the offense.' ") (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)); *United States v. Brady*, 819 F.2d 884, 889 (9th Cir. 1987) (finding that officers had

probable cause based on the detainee's affirmative answer to the question whether he had a gun in his car), *cert. denied*, 484 U.S. 1068, 108 S. Ct. 1032, 98 L. Ed. 2d 996 (1988). The officers immediately read Walters his *Miranda* rights, transported him to the nearest police station, and again advised him of his rights. Without prompting from the officers, Walters thereafter made another statement.

■ "A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda*, 384 U.S. at 444). There are two factors to consider in determining the effectiveness of a *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).

■ The credible, unrebutted testimony at the suppression hearing demonstrates that Walters understood the *Miranda* warning as read to him at Nature's Nook and shown to him in writing at the police station. That testimony further shows that after having been twice advised of his rights, Walters voluntarily made a statement to the officers regarding the firearm that had been found in his possession. The record is totally bereft of any indication of coercion on the part of the officers or incomprehension on the part of Walters. Rather, all signs indicate that Walters' statement at the police station was the "product of rational intellect and free will." *See, e.g., United States v. Bethancourt*, 65 F.3d 1074, 1078 (3d Cir. 1995).

Accordingly, Walters' statement at the police station will likewise not be suppressed.[5]

## III. CONCLUSION

For the reasons given above, Walters' motion to suppress will be denied in its entirety. An appropriate order follows.

---

[5] At the suppression hearing, Walters' counsel asserted that he could not effectively cross-examine Callwood based on Callwood's police report because certain pages were allegedly missing. Those questions were apparently meant to impeach Callwood. The Court ordered counsel to submit further argument in writing. In response to that order, Walters filed a pleading in which he makes the following arguments:

> 1. That Officer Callwood testified under oath that the defendant executed a written Miranda Waiver before making a statement that he found the gun in the trash.
> 2. That the defendant did not execute any such waiver and indeed refused to sign a waiver. . . .
> 3. That Officer Callwood's credibility is now in issue and all of his testimony should be disregarded by the Court.
> 4. That the statement should be suppressed.

(Def.'s Supp. to Mot. to Suppress 1.) Walters has also provided an advice of rights form, which shows that he refused to sign it.

At the suppression hearing, Callwood testified on direct examination that after he escorted Walters to the police station, he advised Walters of his *Miranda* rights in writing. On cross-examination, Callwood stated that Walters signed an advice of rights form. Duly noting Walters' arguments, the Court nevertheless finds Callwood's testimony credible and therefore declines Walters' invitation to disregard that testimony.